NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-600

SANJEEV RAI & another[1]

vs.

STATE LOTTERY COMMISSION.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On April 9, 2024, a State Lottery Commission (commission) hearing officer concluded that the plaintiffs, Sanjeev Rai and his brother Pankaj Rai Ghai,[2] were involved in a scheme to purchase and resell winning lottery tickets on the secondary market.[3] On April 30, 2024, the commission adopted the hearing

---

[1] Pankaj Rai Ghai.

[2] Because of the similarity of the plaintiffs' surnames, we refer to the plaintiffs by their first names to avoid confusion.

[3] Lottery prizes are not assignable, subject to certain limited exceptions. G. L. c. 10, § 28. Because the commission must review whether a winner of a ticket worth more than $600 has past due child support or past due tax liabilities before disbursing the prize, purchasing lottery tickets from lottery winners allows them to avoid their child support or tax obligations. See G. L. c. 10, § 28A.

officer's recommendation to permanently revoke the plaintiffs' lottery sales agent licenses.  The plaintiffs sought judicial review pursuant to G. L. c. 30A, § 14, and, on February 18, 2025, a Superior Court judge found for the commission on cross motions for judgments on the pleadings.  On appeal, the plaintiffs argue that (1) the commission's decision to permanently revoke their lottery sales licenses was not supported by substantial evidence, and (2) the commission applied an arbitrary and capricious standard in revoking the plaintiffs' licenses.  We affirm.

Background.  The commission's licensing action against the plaintiffs began from information that the plaintiffs "coordinated or associated with Ali Jaafar, Yousef Jaafar, and Mohammed [sic] Jaafar (the Jaafar family) in a scheme involving the sale of winning lottery tickets through secondary market transactions and a ticket bundling and cashing operation."[4]  The Jaafar family had participated in a criminal money laundering and tax evasion scheme in Massachusetts for more than a decade. The scheme involved acquiring, claiming, and cashing winning lottery tickets belonging to others by purchasing them at a

_____

[4] On October 19, 2022, Mohamed Jaafar pleaded guilty to one count of conspiracy to defraud the United States.  On December 9, 2022, a jury found Ali Jaafar and Yousef Jaafar guilty of conspiracy to defraud the United States, mail fraud, wire fraud, and willfully filing a false tax return.

discount from lottery sales agent owners or employees through improper transactions.  Following his guilty plea, Mohamed Jaafar produced statements confirming details of the illegal lottery ticket purchasing scheme, which identified the plaintiffs as participants in the scheme.[5]  In Ali Jaafar's postconviction statement, which included an attestation for truth and accuracy, he claimed that he "began purchasing secondary market tickets and wagers over $600 at the urging of . . . Sanjeev 'Sandy' Rai and later his brother Pankaj Rai Ghai."  From 2013 to 2020, the Jaafar family and their runners claimed 595 tickets from Pankaj's stores and 323 tickets from Sanjeev's stores.  The plaintiffs' stores were the two largest sources of tickets involved in the Jaafar family's ticket purchasing scheme.[6]

Additionally, the Internal Revenue Service (IRS) conducted a series of sting operations in which they sold winning lottery tickets at a discount to convenience store owners or employees. On two occasions in October 2019 and November 2019, undercover IRS agents sold winning lottery tickets to employees at 350 Food

---

[5] Ali Jaafar and Yousef Jaafar corroborated these statements after their convictions.

[6] The sales agent whose stores were the third largest source of tickets was responsible for 272 tickets used in the Jaafar family scheme.

3

Mart, a Somerville convenience store owned by Pankaj. Those tickets were later claimed by the Jaafar family or their associates. At the commission hearing, Pankaj stated that in 2017 he had discontinued doing business with Ali Jaafar and had told his employees to stop using the Jaafars as vendors. Notably, however, both employees who purchased winning tickets from the undercover IRS agents worked at 350 Food Mart from 2017 to 2020.

On October 14, 2020, the commission and the IRS interviewed Pankaj and Gurmit Pabla, another sales agent suspected of being involved in the Jaafar family's lottery ticket purchases. At the interview, Pankaj acknowledged that his stores were still purchasing cell phone cards from Ali Jaafar, that he paid Ali Jaafar in cash in a biweekly schedule, and that he called Ali Jaafar one week before the interview. Pankaj initially claimed that he had no knowledge of customers reselling winning lottery tickets at his stores. However, after lottery agents showed Pankaj two photographs taken by IRS agents of 350 Food Mart clerks purchasing winning lottery tickets, Pankaj stated that he caught one of the employees purchasing a $20,000 ticket from a customer for $15,000. The commission interviewer asked Pankaj how the employee had $15,000 in cash to purchase the ticket, and Pankaj stated that he did not know.

4

On May 15, 2023, the commission suspended the plaintiffs' licenses and notified them that the commission intended to revoke their lottery sales licenses.  After a teleconference hearing, a commission hearing officer revoked the plaintiffs' lottery sales licenses on September 19, 2023.  On May 6, 2024, after an appeal within the commission and a second hearing, the commission adopted the second hearing officer's recommendation to permanently revoke the plaintiffs' lottery sales licenses.  The commission also gave ninety-day suspensions to sales agents whose stores sold 200 to 300 tickets claimed by the Jaafar family, and sixty-day suspensions to sales agents whose stores sold 75 to 200 tickets claimed by the Jaafar family.  The plaintiffs were the only two sales agents whose stores sold 300 or more tickets used in the Jaafar family's scheme.

Discussion.  "We review a judge's consideration of an agency decision de novo."  Doe, Sex Offender Registry Bd. No. 523391 v. Sex Offender Registry Bd., 95 Mass. App. Ct. 85, 89 (2019) (Doe No. 523391).  A court may set aside or modify an agency decision if, inter alia, it determines that the agency decision is "unsupported by substantial evidence" or "arbitrary or capricious."  G. L. c. 30A, § 14 (7) (e), (g).

1.  Substantial evidence.  "'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion."  Zafar v. State Lottery Comm'n., 497

5

Mass. 536, 544 (2026), citing G. L. c. 30A, § 1 (6). "Under the substantial evidence test, a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." Murphy v. Contributory Retirement Appeal Bd., 463 Mass. 333, 344 (2012), citing Medi-Cab of Mass. Bay, Inc. v. Rate Setting Comm'n, 401 Mass. 357, 369 (1987).

"Substantial evidence may be based on hearsay alone if that hearsay has indicia of reliability" (quotation and citation omitted). Covell v. Department of Social Servs., 439 Mass. 766, 786 (2003). "When reviewing an examiner's determination that hearsay evidence is substantially reliable, we ask whether 'it was reasonable for the examiner to admit and credit' the facts described in the hearsay evidence" (citation omitted). Doe No. 523391, 95 Mass. App. Ct. at 89.

The plaintiffs categorically deny any wrongdoing whatsoever and contend that the commission's decision to revoke their licenses was unsupported by substantial evidence. Specifically, the plaintiffs argue that the commission relied on unreliable hearsay statements from the Jaafars in reaching their decision. We disagree.

To begin, the commission's decision did not solely rely on the Jaafars' testimony. See Zafar, 497 Mass. at 544. The commission presented evidence of the IRS sting operation, and

6

the fact that Pankaj only conceded that he was aware that his employees purchased tickets after being confronted with photographs from the IRS sting operation depicting two of his employees purchasing winning tickets at a discount from undercover agents.

The commission also presented a spreadsheet of winning tickets used in the Jaafar family's scheme that were initially sold from the plaintiffs' stores and a chart showing that the plaintiffs' stores collectively sold the highest number of tickets used in the scheme. The plaintiffs challenge the commission's reliance on the spreadsheet because the spreadsheets do not identify who sold the tickets to the Jaafars. Nevertheless, the commission was entitled to make reasonable inferences from the data presented to conclude that the plaintiffs had knowledge of, if not direct involvement in, the scheme from the overall volume of tickets sold. See Murphy, 463 Mass. at 344. Cf. Commonwealth v. Woods, 414 Mass. 343, 354 (1993) ("a conviction may rest entirely on circumstantial evidence"). Indeed, a witness for the commission testified that the lottery sales agent responsible for the largest total number of lottery sales originated only seven tickets used in the Jaafar family's scheme.

Additionally, the Jaafars' statements did bear sufficient indicia of reliability such that it was reasonable for the

7

commission to admit and credit their testimony. See Doe No. 523391, 95 Mass. App. Ct. at 89. The Jaafars' detailed statements, which corroborated each other, named multiple sales agents and runners other than the plaintiffs. See id. ("Common indicia of reliability include a detailed account . . ."). The Jaafars' statements were also signed with attestations of truthfulness and submitted to a Federal court, and the Jaafars later sat for interviews with the commission and repeated the same claims in detail.[7] See id. ("Factors that the examiner should consider include the general plausibility and consistency of the victim's or witness's story [and] the circumstances under which it is related . . ." [quotation and citation omitted]). Gurmit Pabla, another lottery sales agent who acknowledged his involvement in the Jaafar family's scheme, corroborated that Ali Jaafar also told Pabla that the appellants were involved in reselling lottery tickets to the Jaafars.[8]

---

[7] In total, the Jaafars identified eighteen sales agents whose stores contributed at least seventy-five winning lottery tickets to the ticket-cashing scheme.

[8] While Pabla contradicted this testimony shortly thereafter, the hearing officer was permitted to credit some of Pabla's answers over others. See Newton v. Commonwealth Employment Relations Bd., 496 Mass. 82, 89 (2025), citing Brookfield v. Labor Relations Comm'n, 443 Mass. 315, 321 (2005) ("A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo").

While the commission's witness acknowledged that the Jaafars had previously provided false statements to the commission, given the totality of the circumstances it was reasonable for the hearing officer to conclude that the Jaafars were being truthful where they no longer had a financial incentive to deceive. See Doe No. 523391, 95 Mass. App. Ct. at 89 (hearing officer should consider "the motives of the narrator" to evaluate reliability of hearsay). The United States Attorney's sentencing memorandum for Ali and Yousef Jaafar also does not reference any postconviction statements as a grounds for recommending a shorter sentence.[9]

The plaintiffs contend that Ali Jaafar was motivated by religious animus to frame them by stating he began purchasing lottery tickets at the plaintiffs' urging.[10] This explanation is undercut by the fact that Pankaj stated that he continued to purchase cell phone cards from Ali Jaafar up to a week before his October 14, 2020 interview with the commission. As such,

---

[9] The United States Attorney recommended a sixty-six-month committed sentence for Ali Jaafar and a fifty-four-month committed sentence for Yousef Jaafar, tracking the sixty-month median sentence imposed for offenders who have engaged in like offenses.

[10] Ali Jaafar is Muslim, and the plaintiffs are Hindu. At the commission hearing, Pankaj stated that his employees told him that they had heard Ali Jaafar make disparaging comments about Hindus.

the commission's decision was supported by substantial evidence. See Zafar, 497 Mass. at 544.

2. The permanent revocation penalty. "A decision is arbitrary or capricious . . . where it lacks any rational explanation that reasonable persons might support" (quotation and citation omitted). Perullo v. Advisory Comm. on Personnel Standards, 476 Mass. 829, 836 (2017). "Once statutory or regulatory violations have been established, the administrative agency has discretion in determining the appropriate sanction." Thomann v. Board of Registration of Real Estate Brokers & Salesmen, 481 Mass. 1006, 1011 (2018). "A reviewing court will not interfere with the agency's imposition of a penalty except in the most extraordinary circumstances." Id. at 1012. "We ordinarily accord an agency's interpretation of its own regulation considerable deference." Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550 (1991).

The plaintiffs contend that the commission's decision to permanently revoke the licenses of sales agents whose stores sold more than 300 tickets used in the Jaafar family's scheme was an arbitrary and capricious standard.[11] The plaintiffs

---

[11] The commission's initial September 19, 2023 decision based its sanction not only on the volume of tickets sourced from the plaintiffs' stores, but the fact that the plaintiffs were "essential" and "primary" coconspirators to the Jaafar family scheme, an apparent reference to Ali Jaafar's claim that he began purchasing tickets at the plaintiffs' urging. However,

10

emphasize that they both own multiple stores that, on average, originated fewer tickets per store than the stores of other sales agents who received less severe sanctions.  We are not persuaded.

To begin, we are not convinced that the commission's policy to sanction its sales agents according to the number of resold tickets per sales agent, rather than the number of resold tickets per store, was arbitrary or capricious.  See Perullo, 476 Mass. at 836.  As the hearing officer noted, the focus of the commission's regulations "pertaining to license suspension and revocation is on the individual licensed agent, and not on the number of store locations owned by an agent."  See 961 Code Mass. Regs. § 2.13 (1998).  See also Warcewicz, 410 Mass. at 550.

Further, it is undisputed that the plaintiffs' stores sold the first and second highest quantities of tickets claimed in the Jaafar family scheme.  See Thomann, 481 Mass. at 1011.  It is not unusual for penalties to differ based on numerical ranges -- a decision which is neither arbitrary nor capricious.  See,

the second hearing officer's April 9, 2024 decision and recommendation, which the commission ultimately adopted, does not refer to the plaintiffs' special role in the scheme to justify their revocations.  See Costello v. Department of Pub. Utils., 391 Mass. 527, 536 (1984) ("we will not supply a reasoned basis for the agency's action that the agency itself has not given" [quotation and citation omitted]).

11

e.g., G. L. c. 94C, § 32E (b) (1)-(4) (differentiating sentencing guidelines for trafficking in a Class B controlled substance based on weight of substance trafficked).  See also Thomann, supra.  Accordingly, there was no error.  See Perullo, 476 Mass. at 836.

Judgment affirmed.

By the Court (Desmond, D'Angelo & Smyth, JJ.[12]),

Clerk

Entered:  July 22, 2026.

---

[12] The panelists are listed in order of seniority.